Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 1075 | **DATE** | 10/18/2004 |
| **CASE TITLE** | USA vs. Anival Punzo | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies defendant's motion to suppress (22-1). Status hearing set to 10/20/04 at 1:30 p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | OCT 19 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| OR | courtroom deputy's initials | 2004 OCT 19 PM 2:01 Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Case No. 03 CR 1075 |
| | ) |
| ANIVAL PUNZO | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Anival Punzo is charged with conspiracy and possession with intent to distribute more than five kilograms of cocaine. He has moved to suppress 191 kilograms of cocaine seized from his garage and inculpatory statements that he made on the date of the seizure and nineteen months later, on the ground that the seizure violated the Fourth Amendment and that the statements resulted from the illegal seizure. The Court held an evidentiary hearing on the motion. For the reasons stated below, the Court denies Punzo's motion.

### Facts

On April 25, 2002, a confidential source working with Immigration and Customs Enforcement agents made arrangements to transport 100 kilograms of cocaine. ICE obtained for the source a Ford Expedition with a global positioning system tracking device. On the morning of April 26, agents observed the Expedition travel to Cicero, where it traveled down an alley and pulled at least partly into the detached garage behind the home at 3239 South 54th Avenue.[1] Agents later observed the Expedition leave the garage. The Expedition was stopped by other law

---

[1] It is unlikely that the Expedition could have pulled into the garage completely, as the garage was occupied by another car and stacks of boxes, including the boxes containing the cocaine.

enforcement officers and was searched. It was found to contain ninety-seven kilograms of suspected cocaine.

Surveillance was set up around the 3239 South 54th Avenue residence, including both ICE agents and local police officers detailed to a joint task force. Eventually the lead ICE agent made the decision to conduct a "knock and talk" to attempt to obtain consent to search the house and garage. Three officers approached the front door to the house. While this was taking place, an ICE agent, J.R. Estes, opened the door to the garage and looked in, observing several stacks of boxes which he suspected contained cocaine. This entry to the garage was indisputably illegal; Estes lacked a warrant or consent. The lead ICE agent, Lindsay (LaJoie) Murphy, observed what Estes was doing, and motioned to him to quit. No information regarding Estes' actions or what he observed was communicated to the officers who were at the front door to the house, and they were unaware of what Estes had done or seen.

Chicago police officer Gerald Lau knocked on the front door, and a man answered. Lau had his gun drawn and was holding it down at his side. The man who answered was Manuel Punzo, the defendant's father. The versions of the events given by Lau and Punzo diverge sharply.

Punzo testified that when he opened the door, several officers charged inside, with guns drawn and pointed at him, and pushed him onto a sofa, yelling, "where are the people?" While two officers stayed with him, others began to go through the house. Around twenty minutes later, Punzo said, he was told to sign a paper, without being told what it was. He did not have his glasses and could not read the paper but signed it anyway, feeling he had no choice.

Lau testified that when the man answered the door, he and the other officers identified

2

themselves as police officers, and Lau asked if they could come inside and talk to the man. The man agreed and allowed them into the house. Lau asked the man if he had any weapons and conducted a protective pat-down for reasons of safety, finding no weapons. The man identified himself as Manuel Punzo. They asked for identification, and he showed them a driver's license which gave a different address. In response to questions, Punzo said that the house was his son's house, that his son was at work, and that he was there to keep an eye on the house because his son expected a delivery of some sort. Lau testified that he asked if Punzo minded if they searched the house and garage, and Punzo replied that was all right. Lau obtained a consent-to-search form and, without filling in the blanks, showed it to Punzo. The form had English text on one side and Spanish text on the other. Punzo signed in the space provided on the Spanish version. Lau and another officer, Charles Honore, both signed the form as witnesses. After this was done, the other officers were advised that consent had been obtained, and a search began. In the garage, boxes were found that contained 191 kilograms of suspected cocaine.

Some time later – perhaps an hour or so – Guadalupe Punzo, the defendant's wife, arrived at the house. Before entering, she was taken to the side of the house, where she was confronted with the fact that the officers had found a large quantity of cocaine in the garage. Mrs. Punzo began to cry and was taken inside the house, where she, too, was asked to sign a consent to search form. By this time, however, the search was largely complete, and the cocaine had already been seized.

Mrs. Punzo was asked to telephone the defendant to ask him to come home. After he did so, he was confronted with the seizure of the cocaine and is claimed to have made several admissions. In November 2003, the defendant was interviewed by agents in Arizona, where he

was then living. He was again confronted with the seizure of the cocaine from his garage and is again claimed to have made a number of admissions.

The consent forms evidently were completed later at the police station, likely by an officer other than Lau or Honore. The time-of-day entry on the form signed by Manuel Punzo was overwritten to show the time 1305 (1:05 p.m.). The time-of-day entry on the form signed by Guadalupe Punzo was originally filled in with 1430, but this was overwritten with the time 1330, and a small amount of opaquing fluid was used to cover up part of the number 4.

Manuel Punzo testified that he had originally gone to the house earlier in the morning to give someone a ride, but the person never arrived. After waiting in his car outside for a lengthy period, he returned to his own home, which was nearby, and called the defendant to say that the person had not shown up. The defendant asked Mr. Punzo to return and wait longer. When Mr. Punzo went back to the house, he went inside, using a key that was in his possession. Mr. Punzo denied he had ever lived at his son's house but stated that he had had the key for several months, from a period when he was doing some work on the house and supervising other workers. He would use the key to let the workers inside to use the bathroom. Mr. Punzo admitted that he had been inside the home on other occasions when his son was not present.

Guadalupe Punzo testified that Manuel had lived in the house for about six months at an earlier point in time and had his own set of keys. She denied ever asking Manuel to go to the house when she was not there and said she was unaware he would be there on April 26.

## Discussion

The defendant argues that Manuel Punzo lacked actual or apparent authority to consent to a search of the defendant's house and garage, and that in any event his consent was not given

voluntarily. Guadalupe Punzo's consent, the defendant argues, was obtained only after the search was completed, and only by confronting her with the fruits of the search, and thus it cannot justify the prior search. The defendant argues that the cocaine must be suppressed from evidence and that his own statements both on the day of the search and in November 2003 must also be suppressed as fruits of the unlawful search.

The government argues that Manuel Punzo had both actual and apparent authority to consent to the search and that his consent was voluntary. It argues that even if Mr. Punzo is found to have lacked authority or to have been coerced to consent, the discovery of the cocaine in the garage was inevitable as Guadalupe Punzo would have consented. It also argues that the defendant's statements were not tainted by the alleged illegal search.

The Court finds that Manuel Punzo had actual authority to consent to a search of his son and daughter-in-law's property. A search of a residence may be justified by consent given by a non-owner "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Such common authority "rests on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n.7. The government has the burden of establishing that Punzo had the necessary authority to consent to a search. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

Manuel Punzo did not live in the home at the time, but he had his own keys, obviously had access to the property at will (as shown by, among other things, his entry into the house on April 26), had authority to allow others to enter the property (as shown by his activities when work was being done there), and had access and control over the property on other occasions

5

relatively contemporaneously with the search (such as when he waited there for his son and daughter-in-law's children to return home from school). "[T]he foundation of third party consent is assumption of risk." *United States v. Jensen,* 169 F.3d 1044, 1049 (7th Cir. 1999) (citing *United States v. Chaidez,* 919 F.2d 1193, 1202 (7th Cir. 1990)). A person who shares property with another "understands that the partner may invite strangers into it"; "'[d]ecisions of *either* person define the extent of the privacy involved, a principle that does not depends on whether the stranger welcomed' into the [property] turns out to be a police officer or another party to the crime." *Id.* (quoting *Chaidez,* 919 F.2d at 1202). A person who has "mutual use of the property by virtue of joint access" has authority to consent, *see United States v. Kimoana,* ___ F.3d ___, 2004 WL 2051381 (10th Cir. Sept. 15, 2004), and in this case the government established that Mr. Punzo had joint access to the home. He therefore had actual authority to consent to a search.

The Court also finds that the government has established that Manual Punzo's consent was given voluntarily. The Court did not find Mr. Punzo to be a particularly credible witness; he was evasive at several points and attempted falsely to minimize his degree of access to the home. Though the government's presentation of evidence regarding the events surrounding the officers' initial entry to the home was less than satisfactory – it presented the testimony of only one of the three officers who conducted the so-called "knock and talk" at the front door – Lau's testimony was credible and was sufficient to establish that the police did not rush into the home, point their guns at Mr. Punzo, push him onto the couch, or order him to sign the consent as he claimed, but rather that he voluntarily permitted them, without threats or other coercion, to conduct the search. The circumstances surrounding the completion of the blank spaces on the consent forms at the

6

police station reflect something less than a model of careful and prudent police work, but they do not undermine the validity of Mr. Punzo's oral or written consent.

Because the Court has found that the government has proved that consent to search was given by a person with authority, we need not address the remaining issues posed by the parties' submissions. Even though Agent Estes made an illegal entry into the garage before consent was given, the government has proved that Mr. Punzo's consent was obtained completely independently from this illegal entry, and thus Agent Estes' misconduct does not taint the seizure of the cocaine or the statements obtained from the defendant. *See Murray v. United States,* 487 U.S. 533, 537-38 (1988).

## Conclusion

For the reasons stated above, the Court denies defendant's motion to suppress [docket # 22-1].

                                                    MATTHEW F. KENNELLY
                                                    United States District Judge

Date:  October 18, 2004